UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

STEPHANIE T.,[1]

                    Plaintiff              DECISION AND ORDER

-vs-

                                             1:20-CV-0322 CJS

COMMISSIONER OF SOCIAL
SECURITY,

                    Defendant.

_____

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant")

which denied the application of Plaintiff for Social Security Disability Insurance benefits

and Supplemental Security Income benefits.   Now before the Court is Plaintiff's motion

(ECF No.8) for judgment on the pleadings and Defendant's cross-motion (ECF No. 9) for

the same relief.   For the reasons discussed below, Plaintiff's application is denied and

Defendant's application is granted.

## STANDARDS OF LAW

The Commissioner decides applications for SSDI and SSI benefits using a five-

step sequential evaluation:

> A five-step sequential analysis is used to evaluate disability claims. *See* 20
> C.F.R. §§ 404.1520, 416.920.   First, the Commissioner considers whether
> the claimant is currently engaged in substantial gainful activity. If he is not,

---

[1] The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in the United States District Court for the Western District of New York, any non-government party will be identified and referenced solely by first name and last initial."

the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment].   Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.[2]  Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform. The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted)

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.   In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).   Further, Section 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see*

---

[2]  Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

*also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773.   Substantial evidence is defined as "more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted).

> The substantial evidence standard is a very deferential standard of review— even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered." *Id*.

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019)

3

(internal quotation marks omitted).

In applying this standard, a court is not permitted to re-weigh the evidence. *See,* *Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).

## FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action.   The Court will refer to the record only as necessary for purposes of this Decision and Order.

On September 28, 2015, Monir Chaudry, M.D. ("Chaudry") performed an outpatient psychiatric evaluation of Plaintiff. Tr. 408-410.   Chaudry noted that Plaintiff had come to Woman's Christian Association ("WCA") Hospital in Jamestown, New York, stating, "I stopped taking my Zoloft and I am smoking pot and drinking also." Tr. 408. Chaudry noted that he was familiar with Plaintiff, and that she had previously sought mental health treatment from Chautauqua County Mental Health ("CCMH"), but had not been serious about pursuing treatment: "The accompanying record indicates the patient used to be at CCMH, but she is not serious.   The patient sometimes comes, sometimes does not come and she is picky and selective." Tr. 408.   Chaudry indicated that Plaintiff

4

had previously exhibited drug seeking behavior to obtain Adderall, stating,

> It is very sad to see Stephanie, a 24-year-old, average built Hispanic female who has the tendency to get Adderall one way or the other by presenting history of ADHD.   This MD never bought it.   She used to be on Zoloft and stopped taking it and now wants back this medicine.

Tr. 410.   Chaudhry further noted that Plaintiff "has a tendency to abuse a lot of street drugs." Tr. 410.   Chaudry indicated that Plaintiff had recently broken up with her boyfriend and had expressed suicidal ideation in order to receive "priority" evaluation in the emergency room. Tr. 408.   Upon examination, however, Chaudhry reported that Plaintiff was "bubbly, smiling, [and] relaxed," with good hygiene, heavy makeup, good eye contact, normal speech, intact memory, goal directed thought processes and no suicidal ideation. Tr. 409.   Chaudhry's diagnoses were "nicotine dependence, continuous," "marijuana dependence, continuous," "alcohol abuse, continuous" and "depressive disorder, not otherwise specified." Tr. 409.   Chaudry recommended that Plaintiff be placed back on Zoloft and pursue supportive psychotherapy. Tr. 410.

Subsequently, it appears that Plaintiff remained in mental health treatment at WCA on-and-off through January 27, 2016, with many "no shows" during that period. Tr. 335, 336, 372-373, 378-379, 385-386.

On October 21, 2015, Plaintiff went to the emergency department ("ED") claiming to feel depressed and "very sad." Tr. 346.   Plaintiff expressed suicidal ideation and stated that "people would be better off without her." Tr. 355.   However, Plaintiff's behavior was reported as "appropriate, cooperative," Tr. 347, and she did not appear to be in acute distress. Tr. 352.   Plaintiff reportedly stated that she had "never" smoked and did not use

alcohol or illicit drugs. Tr. 352.   Plaintiff was discharged in stable condition. Tr. 354.

On November 20, 2015, Plaintiff stated that she felt "moody" and "need[ed] her medication for her ADHD." Tr. 383.

On December 8, 2015, Plaintiff told her therapist that she was "not as depressed" and that her college classes[3] were going "ok." Tr. 380.

On December 15, 2015, Plaintiff admitted to her therapist that she had "self-abused" herself, presumably by cutting herself,[4] to manipulate her ex-boyfriend. Tr. 376 ("Pt. self abused to manipulate her ex whom is staying with her.").   Plaintiff also told her therapist that she had used information that she had learned in her psychology class to self-diagnose herself with borderline personality disorder. Tr. 376.

On January 27, 2016, Plaintiff admitted to her psychologist at WCA, Frederick Verdonik, Ph.D. ("Verdonik"), that she stole money from her boyfriend and family members, evidently to buy drugs, and that she felt guilty about this, and sometimes feigned cutting behaviors and suicidal ideation to deflect attention away form her bad behavior. Tr. 334-335.   Plaintiff indicated that she was doing well with her college classes and getting grades between B's and C's. Tr. 337.   Verdonik noted that Plaintiff "hedges on truth at times" and is "manipulative at times." Tr. 335.

On October 24, 2016, Plaintiff filed an application for SSDI and SSI benefits, claiming a disability onset date of September 30, 2014.   Plaintiff claimed to be disabled since 2014 due to a combination of impairments, primarily related to her mental health,

---

[3] Plaintiff dropped out of high school in tenth grade, but then earned her GED and took college classes. Plaintiff was in regular education classes while in school.
[4] *See below*, medical note from January 27, 2016.

that cause her problems with "focusing, [being] off task, [missing work] and [needing to take] extra breaks" at work. Tr. 40.

In 2011, Plaintiff had previously been awarded disability benefits, but her benefits were terminated in 2016 after the Commissioner concluded that her condition had improved. Tr. 38–39.   The Commissioner apparently made that determination because after being awarded benefits, Plaintiff had stopped attending treatment, causing the Commissioner to conclude that Plaintiff's condition had improved.   Plaintiff did not appeal the cessation of her benefits.[5]

On July 27, 2016, a few months prior to filing these applications, Plaintiff again sought mental health services after being away from treatment. Tr. 870.   According to Plaintiff, the immediate impetus for her returning to treatment was that her previously-awarded disability benefits had ended. Tr. 870.   Plaintiff initially indicated that she did not know why she was seeking treatment, but then indicated that she had "really bad anxiety," as well as mood swings and problems with concentration. Tr. 870.   Plaintiff stated that she wanted to return to work, Tr. 870, and the therapist listed her employment status as, "unemployed, looking for work." Tr. 874.   Plaintiff had previously taken college classes in the field of criminal justice, but indicated that she was presently working on finishing a degree as a medical assistant. Tr. 876

Plaintiff remained in treatment on-and-off through November 9, 2018, though she frequently missed therapy appointments.   Indeed, after her initial return to therapy in July

---

[5] At the subsequent administrative hearing underlying this action, Plaintiff agreed that her benefits had been stopped after the Commissioner concluded that her condition improved because she had stopped seeking treatment for her alleged impairments. Tr. 39.

2016, it appears that Plaintiff did not attend another therapy appointment until April 2017. Tr. 890.

In the meantime, on February 21, 2017, Kristina LaBarbera, Psy.D. ("LaBarbera") performed a consultative psychiatric evaluation at the Commissioner's request. Tr. 793-797. LaBarbera reported that Plaintiff was not presently receiving mental health treatment. Plaintiff reported having a variety of mental health symptoms, including depression, crying spells, hopelessness, irritability, difficulty concentrating, panic attacks and "manic symptomology." Tr. 793-794. However, upon examination, LaBarbera reported largely normal findings, including full affect, neutral mood, intact attention and concentration, average cognitive functioning, fair insight and fair judgment. Tr. 795-796. LaBarbera noted, though, that Plaintiff's memory skills were mildly impaired due to emotional distress. Tr. 795. LaBarbera reported that Plaintiff was able to cook, clean, perform shopping, and care for her two children. Tr. 796. Plaintiff indicated that she "spen[t] her days caring for her children and watching TV while in bed." Tr. 796. LaBarbera diagnosed Plaintiff with Bipolar type II disorder, panic disorder, attention deficit hyperactivity disorder ("ADHD"), cannabis abuse, and unspecified personality disorder with borderline features. Tr. 797. LaBarbera stated that Plaintiff's prognosis was "good, given [her] current level of functioning." Tr. 797. LaBarbera's medical source statement was as follows:

> The claimant has no limitations in her ability to understand, remember, and apply simple directions and instructions; interact adequately with supervisors, coworkers and the public; sustain concentration and perform a regular attendance at work; maintain personal hygiene and appropriate attire; and maintain awareness of normal hazards and take appropriate

> precautions.   She is mildly limited in her ability to understand, remember, and apply complex directions and instructions, and use reason and judgment to make work-related decisions.   She is moderately limited in her ability to regulate emotions, control behavior, and maintain well-being. These deficits are related to her diagnosis of depression and possible personality disorder.   Difficulties are caused by distractibility.

Tr. 796.   Notably, at the time of LaBarbera's examination, Plaintiff was reportedly not taking any medication for her alleged mental health symptoms or receiving any therapy. Tr. 793–797.

Subsequently, in April 2017, again Plaintiff returned to mental health therapy.   On May 3, 2017, Plaintiff told her therapist that her "mind [was] running so much," and that she felt sad and frustrated by her inability to concentrate. Tr. 896.   Plaintiff, though, denied having problems with anxiety or memory.   Upon examination, the therapist noted that Plaintiff was dressed neatly and appropriately with good hygiene, and that she had poor eye contact at time, though still "within normal limits." Tr. 898.   The therapist noted that Plaintiff did not seem depressed or anxious. Tr. 898.

On May 26, 2017, Plaintiff's therapist reported that Plaintiff, who was still taking college classes at the time, had been "struggling with finals [(final exams)] for a few days." Tr. 904.   Plaintiff reported having symptoms including worry, exasperation, trouble concentrating and focusing, some depression and some anxiety. Tr. 904.   Plaintiff denied any delusions, hallucinations or hypomania. Tr. 904.   Upon examination, the therapist reported that Plaintiff appeared clean, cooperative, calm, logical, fluent, goal directed, thoughtful and articulate, and quite rational. Tr. 904. Plaintiff's mood was described as, "fairly good. Stable and appropriate." Tr. 904.   The therapist indicated that Plaintiff was

"generally functioning adequately." Tr. 904. Nevertheless, Plaintiff was prescribed medications including Adderall, Klonopin and Trileptal. Tr. 930.

On November 13, 2017, Plaintiff's therapist reported that Plaintiff presented with an "elevated mood with heightened anxiety." Tr. 934. Plaintiff reportedly stated that she "desires to be a good mom and finish her college classes but [wa]s struggling to stay focused." Tr. 934. The therapist noted that Plaintiff struggled to stay focused and often "jumped off topic." Tr. 934. Plaintiff reported engaging in "cutting behaviors," in the context of being angry at her ex-boyfriend, who was seeing a new girlfriend. Tr. 934. Plaintiff reported having impulsiveness, mood fluctuations, depression, anxiety, flashbacks and inconsistent sleep. Tr. 937. The therapist opined that Plaintiff's symptoms were indicative of bipolar disorder, and encouraged Plaintiff to take her prescribed medications.

On December 17, 2017, Plaintiff told her therapist that she was struggling to "cope with stress in her daily life," and felt pressured to have "a man in her life." Tr. 944. The therapist noted an improvement in Plaintiff's mood which she attributed to medication. Tr. 944 ("Some mild improvement in mood since restarting medication."). The therapist further stated that Plaintiff was "gaining insight regarding the benefits of medication compliance to help manage her mood." Tr. 944.

On March 26, 2018, Plaintiff met with treating physician's assistant Alicia Snow, PA ("Snow"), for mental health medication management. Tr. 994–995. Upon examination, Snow reported that Plaintiff seemed "anxious and cooperative," and that her mood was "much, much better." TR. 994. Snow indicated that Plaintiff had good eye

contact, linear and goal-directed though processes, normal speech, congruent affect, good grooming, intact memory, intact attention, intact concentration, and limited judgment/insight "with much improvement." Tr. 994.   Snow continued Plaintiff on Adderall, Klonopin and Latuda. Tr. 995.

On April 18, 2018, Plaintiff told her therapist that she had stopped smoking marijuana after becoming "paranoid," though she previously felt that marijuana helped her symptoms. Tr. 999.   Plaintiff reported mental health symptoms including anxiety, impulsiveness and depression. Tr. 999.   Plaintiff complained of having "flashbacks" involving physical and mental abuse by her father when she was a child. Tr. 999. Regarding her medications, Plaintiff stated that she "loved" Latuda, and was "feeling good" with regard to bipolar symptoms. Tr. 999.   Plaintiff also stated that she felt Adderall helped with her "ADHD symptoms." Tr. 999.

On April 24, 2018, Plaintiff told her therapist that she had decided to stop taking her medications for a few days, and had "noticed a significant difference in her mood," after which she resumed taking her medications. Tr. 1005.

On January 9, 2019, a hearing was held before an Administrative Law Judge ("ALJ"), at which Plaintiff appeared with her attorney.   The ALJ took testimony from Plaintiff and from a vocational expert ("VE").

On January 24, 2019, the ALJ issued a decision finding that Plaintiff was not disabled at any time between the alleged onset date, September 30, 2014, and the date of the decision.   Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff had not engaged in substantial gainful activity ("SGA") since the

alleged onset date.   At step two, the ALJ found that Plaintiff had the following severe impairments: "affective disorder, anxiety disorder, personality disorder, and Attention Deficit Hyperactivity Disorder (ADHD)." Tr. 13.   At step three, the ALJ found that Plaintiff's impairments, including non-severe impairments, either singly or in combination did not meet or medically equal the severity of a listed impairment.   Prior to reaching the fourth step of the sequential evaluation, the ALJ found that Plaintiff had the following residual functional capacity ("RFC"):

> [C]laimant has the [RFC] to perform a full range of work at all exertional levels but with the following non-exertional limitations:   The claimant is able to perform simple work tasks in a non-assembly line type production-paced setting, involving no interaction with the public and only occasional interactions with supervisors and coworkers, but no team or tandem collaborative type work.   She is able to make basic work-related decisions and adapt to simple changes in a routine work setting.

Tr. 15.   At the fourth step, the ALJ found that Plaintiff had no past relevant work.   At the fifth step, the ALJ found that Plaintiff could perform several jobs that the VE identified. Tr. 22.   Consequently, the ALJ found that Plaintiff was not disabled.   Plaintiff appealed that ruling, but on January 13, 2020, the Appeals Council declined to review the ALJ's decision. Tr. 1.

As noted above, the ALJ found that Plaintiff's severe impairments consisted of "affective disorder, anxiety disorder, personality disorder, and [ADHD]."   Plaintiff also claims to suffer from "bipolar disorder," a diagnosis that was made by several doctors. However, the ALJ did not specifically mention bipolar disorder in the "Step-Two section" of his decision.   The ALJ did, though, state at that point in the decision, that, "Regardless

of their characterization, I have considered all of the claimant's impairments, severe and non-severe, as well as all associated documented symptoms of record, in assessing her residual functional capacity." Tr. 13.

Similarly, the ALJ did not expressly mention bipolar disorder in his discussion at step three of the sequential evaluation.   In fact, the ALJ did not expressly mention any of Plaintiff's specific diagnoses, except for her ADHD. Tr. 14.   Rather, the ALJ referred to Plaintiff's "mental impairments" generally during his step-three discussion, and focused on particular symptoms. *See*, Tr. 14 ("The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06 and 12.15.").

The ALJ did, however, expressly discuss Plaintiff's bipolar disorder when explaining the RFC finding.   Indeed, the ALJ expressly referred to "bipolar disorder" three times, and alluded to it several additional times, such as when referencing Plaintiff's "roller coaster" moods, "hypomanic symptoms," and "trouble with mania." Tr. 17–20.   The ALJ stated, for example, that,

> [C]laimant is diagnosed with bipolar disorder, anxiety disorder, personality disorder and ADHD.   She has symptoms including anxiety, mood swings, crying spells, feelings of guilt, hopelessness, loss of usual interests, difficulty with concentration, sleep disturbance, and panic attacks.

Tr. 17.   The ALJ further noted that treating physician Dr. Gibbon prescribed Plaintiff Trileptal and clonazepam (Klonopin) for her bipolar symptoms. Tr. 18.   The ALJ also discuss how Plaintiff was eventually prescribed Latuda, which greatly improved her bipolar symptoms. Tr. 19 ("By mid-May, the claimant report[ed] feeling well, and called

13

Latuda "my miracle drug.").

In this action, Plaintiff contends that the Commissioner's decision denying benefits must be reversed primarily because the ALJ allegedly "fail[ed] to evaluate" Plaintiff's "bipolar disorder at Step Two or beyond."[6]

Defendant disputes Plaintiff's arguments and maintains that the ALJ's decision is free of reversible legal error and supported by substantial evidence.[7]

The Court has carefully reviewed and considered the parties' submissions.

DISCUSSION

<u>The ALJ's Alleged Failure to Consider Plaintiff's Bipolar Disorder</u>

Plaintiff argues that "[t]he ALJ failed to evaluate Plaintiff's medically determinable bipolar disorder at Step Two *or beyond*."[8] (emphasis added). Plaintiff reiterates this point by stating:

> The ALJ found Plaintiff to have severe mental impairments including affective disorder, anxiety disorder, personality disorder, and ADHD. However, *at no point* did the ALJ discuss Plaintiff's diagnosed bipolar disorder and its attendant symptoms.

Pl. Mem. of Law, ECF No. 8-1 at p. 8 (emphasis added).   Plaintiff further contends that the ALJ's alleged failure to consider her bipolar disorder was extremely prejudicial, since the ALJ "faulted" her for her noncompliance with treatment without considering that such noncompliance was a symptom of her bipolar disorder.[9] In this regard, Plaintiff argues

---

[6] Pl. Mem. of Law, ECF No. 8-1 at pp. 1, 8.

[7] Defendant argues, for example, that Plaintiff's argument lacks merit since "[t]he ALJ considered bipolar disorder at the subsequent steps of the sequential evaluation and accounted for any functional limitations related to the disorder in his RFC finding." Def. Memo of Law, ECF No. 9-1 at p. 5.

[8] Pl. Mem. of Law, ECF No. 8-1 at p. 8.

[9] Pl. Mem. of Law, ECF No. 8-1 at p. 11 ("[T]he ALJ repeatedly faulted the claimant for non-compliance

that her admitted non-compliance with treatment was caused by her bipolar disorder.[10]

Plaintiff also maintains that her bipolar disorder prevents her from working even part-time, and that the ALJ's contrary finding is not supported by substantial evidence.

However, the Court finds that Plaintiff's arguments lack merit.   To begin with, Plaintiff is simply incorrect to assert that the ALJ failed to discuss bipolar disorder "at Step Two *or beyond*."   As discussed earlier, the ALJ did not mention bipolar disorder at Step Two, but he did discuss it at Step Four. Moreover, the Court believes that the ALJ also considered Plaintiff's bipolar disorder at Step Three, though he did not expressly mention it, as indicated earlier. In that regard, at Step Three the ALJ considered all of the symptoms of Plaintiff's "mental impairments" to the extent they related to the relevant listings.   In sum, it appears to the Court that the ALJ either simply forgot to list bipolar disorder at Step Two or, more likely, that he just referred to it generally under the terms "affective disorder" and/or "personality disorder." Tr. 13.[11]

Nevertheless, even assuming *arguendo* that the ALJ technically erred by failing to list bipolar disorder as one of Plaintiff's impairments at Step Two, such error is harmless here.   More specifically, the Second Circuit has indicated that such an error may be harmless, provided that the ALJ considers the impairment at the subsequent steps of the

---

with treatment, but did not distinctly consider whether such difficulties could be a manifestation of plaintiff's bipolar disorder.   . . .   [A]t no point did the ALJ discuss whether bipolar disorder affected Plaintiff's ability to comply with treatment.   Instead, he used this non-compliance against Plaintiff, which is wholly improper.") (internal quotation marks omitted).

[10] *See*, Pl. Memo of Law, ECF No. 8-1 at pp. 10-11 ("[Plaintiff] admitted to Dr. Ames that she had not been good about taking her medication due to mania and difficulty remembering it. (Tr. 828)").

[11] During the administrative hearing, the ALJ used the term "mental health" to refer to Plaintiff's various diagnoses, including anxiety, depression, bipolar disorder and ADHD. See, Tr. 47 (ALJ: "[Y]ou're taking, looks like, four medication for your mental health, whether it's anxiety, depression, bipolar disorder or ADHD.").

sequential evaluation, and on this point this Court previously stated:

> At step two of the sequential evaluation, the Commissioner "consider[s] the medical severity of [the claimant's] impairment(s)." 20 C.F.R. § 404.1520(a)(4)(2). If the Commissioner fails to consider an impairment at step two, the error may be harmless if the Commissioner continues through the remaining steps and considers the impairment that was omitted at step two. *See, Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) ("[Plaintiff] claims that the ALJ's step two analysis was deficient because the ALJ excluded her anxiety disorder and panic disorder from his review. ... [A]ny error would be harmless. At step two, the ALJ identified other "severe impairments[,]" and therefore proceeded with the subsequent steps. And, in those subsequent steps, the ALJ specifically considered her anxiety and panic attacks. Because these conditions were considered during the subsequent steps, any error was harmless.") (citation and internal quotation marks omitted).
>
> However, remand is appropriate if the Commissioner fails to consider the omitted impairments at the subsequent steps of the sequential evaluation. *See, Pickering v. Comm'r of Soc. Sec.*, No. 817CV700GTSWBC, 2018 WL 3520844, at *4 (N.D.N.Y. June 12, 2018) ("Remand is recommended because the ALJ failed to consider Plaintiff's thoracic outlet syndrome at step two. The ALJ's error cannot be deemed harmless because substantial evidence in the record contained evidence of work related functional limitations due to this impairment which the ALJ failed to consider in formulating Plaintiff's RFC."), *report and recommendation adopted sub nom. Katy P. v. Comm'r of Soc. Sec.*, No. 817CV0700GTSWBC, 2018 WL 3520427 (N.D.N.Y. July 20, 2018).

*Lozada v. Comm'r of Soc. Sec.*, No. 1:19-CV-0640 CJS, 2020 WL 5350176, at *4

(W.D.N.Y. Sept. 4, 2020). [12]

---

[12] *See also, Rivera v. Colvin*, 592 F. App'x 32, 33–34 (2d Cir. 2015) ("At step two, the ALJ found that Rivera's anxiety and PTSD were not severe impairments. Rivera argues this conclusion is not supported by the record, as he was diagnosed with both anxiety and PTSD. However, even assuming that the ALJ erred at step two, this error was harmless, as the ALJ considered both Rivera's severe and non-severe impairments as he worked through the later steps. The ALJ discussed whether the mental impairments met a listing at step three and considered his mental impairments as part of the residual functional capacity finding.").

Here, the Court finds that the ALJ's error at Step Two was harmless, since the ALJ found that Plaintiff had other severe impairments at Step Two, and he considered Plaintiff's bipolar disorder at the subsequent steps, and particularly when making his RFC determination. Tr. 17-20.   To the extent that Plaintiff contends that ALJ did not consider Plaintiff's bipolar disorder at the subsequent steps, the Court disagrees for the reasons already discussed.

Plaintiff nevertheless argues, in the alternative, that the ALJ erroneously "faulted" Plaintiff for her noncompliance with treatment, without considering that such noncompliance was a symptom of her bipolar disorder.[13]   Several district court decisions in this Circuit have held that an ALJ must consider whether a claimant's non-compliance with treatment is a symptom of a mental health impairment. *See, e.g., Kent v. Saul*, No. 19-CV-097-MJR, 2020 WL 4581693, at *4 (W.D.N.Y. Aug. 10, 2020) ("Here, the ALJ concluded, at least in part, that Plaintiff lacked credibility because of her noncompliance with treatment, without considering whether there was an explanation for her actions or whether her bipolar disorder affected her judgment to appropriately comply with treatment. Accordingly, the ALJ erred when he discounted Plaintiff's credibility for this reason and the case must be remanded.") (collecting cases).

---

[13] Pl. Mem. of Law, ECF No. 8-1 at p. 11 ("[T]he ALJ repeatedly faulted the claimant for non-compliance with treatment, but did not distinctly consider whether such difficulties could be a manifestation of plaintiff's bipolar disorder.  . . .  [A]t no point did the ALJ discuss whether bipolar disorder affected Plaintiff's ability to comply with treatment.   Instead, he used this non-compliance against Plaintiff, which is wholly improper.") (internal quotation marks omitted).

However, the Court does not agree that the ALJ erred in this manner.   To begin with, the Court does not agree that the ALJ "faulted" Plaintiff for her noncompliance. Instead, the ALJ merely observed that Plaintiff was non-compliant with treatment in several instances, and that her functioning improved when she was compliant with treatment.   It appears true, though, that the ALJ partially relied on this evidence to find that Plaintiff's symptoms were not as severe as she claimed.

The Court, though, does not agree that the ALJ failed to consider the reasons why Plaintiff was non-compliant with treatment.   Rather, the transcript of the administrative hearing indicates that the ALJ was quite interested in learning the reasons for that non-compliance. Tr. 54–57.

For example, the ALJ questioned Plaintiff about the frequency with which she was supposed to meet with her mental health therapist.[14]   Plaintiff admitted that her therapist wanted to see her "once a week," but Plaintiff went much less frequently.   When asked why, Plaintiff implied that she did not feel comfortable with her new therapist, but did not really give a definitive answer. Tr. 55-57 (Plaintiff: "I know with the new one, I met her once or twice, and it's still taking me time to – because they want to see me once a week. . . .   And it's, like, I'd love to do it, but I'm just – I don't know.").   Upon further questioning by the ALJ on that point, Plaintiff admitted that her symptoms improved when she was compliant with treatment, but she nevertheless indicated that she preferred not to discuss her problems with a therapist because she did not want to burden anyone with her problems. Tr. 57 ("I notice there's times where, yes, my life gets more chaotic without

---

[14]  Plaintiff was frequently a "no show" at her mental health therapy sessions. *See*, Exhibit B14F; Tr. 892.

speaking to them [(therapists)], but I'm just come to the point where I just like to keep it quiet.   Why open up anymore and put my problems on somebody else?   It's a lot to do with, like, guilt, and I just – I don't know.").   Notably, Plaintiff did not indicate that her failure to attend therapy sessions was due to her bipolar disorder.

Similarly, the ALJ observed that Plaintiff's non-compliance in taking her prescribed medications was not across-the-board, as one might expect if such non-compliance was caused by bipolar disorder.   Rather, Plaintiff took medications that she liked, but stopped taking others for particular reasons.[15]   For example, Plaintiff was compliant in taking Latuda for her bipolar symptoms, and described it as a "miracle drug." Tr. 19.   However, Plaintiff stated that she stopped taking Trileptal because "she was feeling better," Tr. 18, and that she stopped taking another drug because it made her "feel funny." Tr. 20, 1033. At other times, Plaintiff indicated that she preferred smoking marijuana to taking prescribed medications. Tr. 19–20.[16]   The ALJ observed that on some occasions, Plaintiff claimed that she had "forgotten" to take certain medications, but mental status exams showed that her memory and concentration were intact. Tr. 19 ("[H]er memory and concentration were grossly intact.").   In any event, the ALJ considered Plaintiff's non-compliance, but nevertheless found that, even with such non-compliance, her overall condition was not disabling, and that she could work within the parameters of the RFC finding. Tr. 20 (Discussing Plaintiff's non-compliance with treatment, but concluding:

---

[15] On May 3, 2017, Plaintiff told her mental health therapist that she had stopped taking all medications a year earlier. Tr. 897.

[16] Plaintiff's purported desire to stop smoking marijuana was a frequent topic in her mental health therapy sessions.   For example, when asked about her mental health treatment goals, Plaintiff reportedly stated, "She wanted to remain the same with the addition of ceasing to smoke marijuana." Tr. 1039.

"Nonetheless, the record shows that the claimant's improvement is sufficient to allow for functioning within the residual functional capacity outlined above."). In that regard, the ALJ observed that even with such non-compliance, Plaintiff "was still able to take classes, care for her children with assistance, and work a part-time job." Tr. 20. Moreover, the ALJ noted that the opinion of Dr. LaBarbera, discussed earlier, and to which the ALJ gave partial weight, was rendered at a time when Plaintiff claimed she was not taking any medication or pursuing any therapy. Tr. 21

Accordingly, the ALJ considered the proffered reasons for Plaintiff's non-compliance with her doctor's treatment recommendations. The Court therefore finds that Plaintiff's argument on this point lacks merit.

Finally, Plaintiff contends that the ALJ's finding that Plaintiff was capable of sustained full-time work was erroneous, since Plaintiff required numerous accommodations even to maintain her part-time employment. However, the ALJ explored that point, *see, e.g.*, Tr. 17 (1st full paragraph) and nevertheless found both that Plaintiff's statements about her limitations were not entirely consistent with the record, and that Plaintiff could perform full-time work within the parameters of the RFC finding. Tr. 14-15, 17-20. Those findings are supported by substantial evidence. *Id.*

CONCLUSION

For the reasons discussed above, Plaintiff's motion (ECF No.8) for judgment on the pleadings is denied and Defendant's cross-motion (ECF No. 9) for the same relief is granted.   The Clerk of the Court is directed to enter judgment for Defendant and close this action.

So Ordered.

Dated: Rochester, New York
       September 15, 2021

ENTER:

CHARLES J. SIRAGUSA
United States District Judge